T.C. Memo. 2000-6

UNITED STATES TAX COURT

ESTATE OF ETHEL JOSEPHINE SPOWART HINZ,
DECEASED, LESTER F. HINZ, JR., EXECUTOR, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8194-97.                    Filed January 6, 2000.

When decedent (D) died on May 4, 1992, she owned
several parcels of real property located in California.
H, the executor of D's estate, employed C, "the family
attorney", to "do the federal estate tax return."  H knew
the estate tax return was due Feb. 4, 1993, 9 months from
the date of D's death.  Before the estate tax return was
due, C told H that an extension for the time to file the
estate tax return could be obtained.  C timely filed a
request for a 5-month, 27-day extension of the time to file
and a 10-month, 27-day extension of the time to pay the
estate tax.  Under sec. 6081, I.R.C. 1986, the maximum
extension available for filing an estate tax return is 6
months and under sec. 6161, I.R.C. 1986, the maximum
extension for paying the estate tax is 1 year.  R approved a
6-month extension for the time to file and a 1-year
extension for the time to pay the estate tax.  The extended
due date for filing the return was Aug. 4, 1993, and for the
payment of the tax liability was Feb. 4, 1994.  After the
extension request was filed, H did not contact C or inquire

into the status of the extension or the tax return. After the extended filing due date had passed, C contacted H to get the necessary real property appraisals. The estate tax return was filed on Feb. 4, 1994, 6 months after the extended filing due date.

On the untimely filed estate tax return, the estate elected under sec. 6166, I.R.C. 1986, to pay in installments the estate tax related to certain of D's real estate interests. R tentatively allowed the sec. 6166, I.R.C. 1986, election. Ten months later, R notified H that the sec. 6166, I.R.C. 1986, election was denied because it was made on an untimely filed tax return.

1. Held: Fair market values of the properties determined. Sec. 2031, I.R.C. 1986.

2. Held, further, P is liable for an addition to tax for failure to timely file the estate tax return. Sec. 6651(a)(1), I.R.C. 1986; United States v. Boyle, 469 U.S. 241 (1985).

3. Held, further, P is not liable for an addition to tax for failure to timely pay the estate tax liability shown on P's estate tax return. Sec. 6651(a)(2), I.R.C. 1986.

Francis Burton Doyle, for petitioner.

G. Michelle Ferreira, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHABOT, Judge: Respondent determined a deficiency in Federal estate tax and additions to tax under sections 6651(a)(1)[1]

_____

[1] Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1986 as in effect for the date of decedent's death.

(late filing of tax return) and 6651(a)(2)(late payment of liability shown on tax return) against petitioner in the amounts of $1,732,348, $530,094, and $297,523,[2] respectively. By amendment to petition, petitioner claims an overpayment of estate tax. After concessions by both sides, the issues for decision are as follows:

(1) What the fair market values were of four of decedent's real properties on the date of decedent's death;

(2) whether petitioner is liable for an addition to tax under section 6651(a)(1); and

(3) whether petitioner is liable for an addition to tax under section 6651(a)(2).

FINDINGS OF FACT

In General

Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference.[3]

---

[2]    In the notice of deficiency, the amount of the addition to tax under sec. 6651(a)(2) was determined as $297,523 "computed to the date of this notice" (Feb. 3, 1997), plus 0.5 percent per month, to a maximum of 25 percent. The proper amount is to be determined in the computation under Rule 155.

Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice and Procedure.

[3]    At trial, respondent raised certain relevance objections to petitioner's Exhibits 5 through 8 and 10 through 18. The Court
(continued...)

When the petition was filed in the instant case, both the place for the estate's administration and the executor's legal residence were in Saratoga, California, and the estate's probate administration was in the Superior Court for Santa Clara County, California.

Chronology

Decedent died on May 4, 1992. At the time of her death, decedent owned several real properties located in and around Santa Clara, California.

In her holographic will, dated November 29, 1991, decedent named her son, Lester F. Hinz, Jr. (hereinafter sometimes referred to as Hinz), as sole heir and executor of her estate. This was about the time that decendent's daughter died. Hinz and decedent's daughter were decedent's only children. In May 1992, Hinz engaged William R. Christy (hereinafter sometimes referred to as Christy) to represent the estate and, as part of that representation, to "do the federal estate tax return". Christy had been "the family attorney" for about 40 years. When Hinz

---

[3](...continued)
overruled these objections, ruling that these exhibits are admissible for all purposes and that respondent had a standing objection as to the expressed relevance concerns. The Court also gave respondent the right to renew these objections on opening brief, but only if respondent's counsel gave appropriate notice to petitioner's counsel of an intent to renew the objections on brief. Respondent has not renewed these relevance objections on brief.

hired Christy, Hinz knew the estate tax return was due 9 months from the date of decedent's death.

Christy had been licensed to practice law in California since 1949--he had considerable experience handling probate and estate matters, but had filed only 12 to 15 Federal estate tax returns. The record does not indicate whether Christy had done any work in connection with the estates of decedent's husband, who died in 1960, or decedent's daughter.

On June 11, 1992, Christy filed with the Superior Court for Santa Clara County a petition on Hinz's behalf for the probate of decedent's estate. The petition for probate listed seven real properties[4] and estimated their aggregate value as $1,100,000. The $1,100,000 amount was based on the Santa Clara County Assessor's records. On July 29, 1992, the Superior Court appointed Hinz as executor of decedent's estate. Before the estate tax return was due, Christy advised Hinz that the estate could receive an extension of time in which to file its estate tax return. Hinz did not ask Christy what the extended due date would be.

---

[4]    The parties have stipulated to the fair market values of two of these seven properties. Two of the remaining five parcels are dealt with as one property, infra, the Lafayette Property. As a result, the parties have presented the valuations issue as dealing with four properties.

On January 28, 1993, Christy timely filed a Form 4768,
asking that the due date for filing the estate tax return be
extended by 5 months and 27 days to July 31, 1993, and that the
due date for paying the estate tax be extended by 10 months and
27 days to December 31, 1993.

Christy attached the following statement to the Form 4768:

STATEMENT RE EXTENSION OF TIME TO FILE FORM 706

It is impossible to file a reasonably complete return by
February, 1993, because of difficultly in gathering
information necessary to identify and appraise decedent's
real properties.  It is anticipated from work already done
by counsel, probate appraisers, and title company, that
appraisals will be done and an accurate return filed by July
1, 1993.

The estate's real properties appear to consist of 7 parcels
[see supra note 4] in Santa Clara County, California.
Deferred maintenance and hidden defects affecting market
value need to be explored.

On February 11, 1993, respondent approved a 6-month
extension for filing, to August 4, 1993, and a 1-year extension
for paying, to February 4, 1994.  Table 1 shows the original due
dates, the extended due dates requested by Christy, and the
extended due dates approved by respondent.

Table 1

|  | Original | Requested | Approved |
|---|---|---|---|
| Tax return due date | 02/04/93 | 07/31/93 | 08/04/93 |
| Payment due date | 02/04/93 | 12/31/93 | 02/04/94 |

On the Form 4768 Christy had caused to be typed in the
"Extension date requested" boxes of part II (extension for

filing) and part III (extension for paying) "7-31-93" and "12-31-93", respectively.  On the returned Form 4768 in light red ink (1) lines were drawn through "7" and "31" in part II and these numbers were replaced by "8" and "4", respectively, and (2) lines were drawn through "12", "31", and "93" in part III and these numbers were replaced by "2", "4" and "94", respectively.  Also, on the returned Form 4768, part V, (1) item 1 (extension for filing) is shown as approved and there is penciled in "080493", and (2) item 2 (extension for paying) is shown as approved and there is penciled in "020494".  The heading of part V is printed in boldface type as follows:  "Notice to Applicant--To be completed by Internal Revenue Service".  Finally, on the returned Form 4768, part V, item 1 (extension for filing), there is stamped in faint blue ink the following:  THE MAXIMUM EXTENSION ALLOWED FOR FILING IS 6 MONTHS.  On the Form 4768, part II (extension for filing), there are not any marks on the "93" that Christy had typed in as part of the "7-31-93" requested extension.

Christy interpreted the returned Form 4768 as having extended the due date for filing to February 4, 1994.  In late 1993 (after August 4, 1993) or early 1994 Christy told Hinz that he had received an extension of time until February 4, 1994, to file the estate tax return, and reminded Hinz that appraisals were needed for the real estate.  This was the first time that

Hinz learned what Christy thought was the extended due date for the tax return. Hinz had not asked Christy what the extended due date was. By then, Hinz and Christy decided that they had little choice but to use the probate referee's figures. However, Christy and Hinz thought those amounts were too high, so Christy reduced the probate referee's figures by 25 percent. See infra table 2, line 1, for the values shown on the estate tax return. At Christy's suggestion, Hinz agreed to elect under section 6166 to pay the estate tax in installments. Christy prepared the estate tax return and signed it as return preparer.

Hinz and Christy executed the estate tax return on February 1, 1994. Neither the returned Form 4768 nor a copy thereof was attached to the tax return when Hinz signed it. Hinz first saw the returned Form 4768 or a copy thereof at sometime after Hinz executed the tax return. At the time the estate tax return was filed, Christy and Hinz believed that this tax return was timely.

The estate tax return, showing a net estate tax and balance due of $3,880,270.19, was filed on February 4, 1994, 21 months after decedent's death and 6 months after the August 4, 1993, extended due date. This tax return includes an election under section 6166 to pay the estate taxes in nine installments starting May 4, 1997, with annual interest payments starting May 4, 1994.

By letter dated March 30, 1994, and addressed to Hinz at his home address, respondent tentatively allowed petitioner's section 6166 election. This letter states that there is a balance due of $507,914.99 ($220,402.67 for nondeferred tax, and the remainder for interest and penalties), which is to be paid by April 25, 1994.

By letter dated February 6, 1995, and addressed to Hinz at his home address, respondent states that petitioner did not meet the requirements of section 6166 because the estate tax return was not filed timely. This letter states that there is a balance due of $5,297,476.68 ($3,500,270.19 for tax, and the remainder for interest and penalties), which is to be paid by February 27, 1995.

By letter dated March 8, 1995, respondent informed Christy that decedent's estate tax return was being examined. This letter asks Christy to send numerous records of the estate to respondent. Sometime after Christy received the March 8, 1995, letter, the agent who was conducting the examination of decedent's estate tax return told Christy that decedent's estate tax return was filed late. Notwithstanding the February 6, 1995, letter to Hinz, this was the first time that Christy learned that decedent's estate tax return may have been filed late. At the suggestion of this agent, on November 25, 1996, Christy wrote a letter to the District Director explaining that because Christy's

"eyesight is not what it used to be", Christy misread the extension and inadvertently filed decedent's estate tax return late. Christy later found out that he was suffering from an eye condition called macular degeneration and suspects that this had already begun to affect his eyesight by early 1993.

On February 3, 1997, respondent issued a notice of deficiency determining a tax liability of $5,612,618, almost 45 percent more than the amount reported on the filed estate tax return.

On February 6, 1997, an amended estate tax return was submitted to respondent.[5] This amended tax return shows a tax liability of $1,771,665, almost 55 percent less than the amount reported on the filed estate tax return.

-----

Hinz delegated to Christy the duty of timely filing the tax return.

-----

[5] On opening brief, respondent asks us to find that this amended estate tax return was "filed" on Feb. 6, 1997. Petitioner does not object to this proposed finding. However, the parties stipulate as follows:

> This Amended Form 706 Federal Estate tax return has been submitted to the Internal Revenue Service on February 6, 1997, but has not been filed pending resolution of the issues between the estate and the Internal Revenue Service on the original Form 706 Federal estate tax return.

We have not found anything in the record to indicate that the parties' stipulation was incorrect. Our findings are in accord with the parties' stipulation and not the parties' proposed findings of fact.

The Properties

Among the properties included in decedent's gross estate, the values of which are reported on decedent's estate tax return, are four real properties located in Santa Clara County, California, as follows:

(1) 14521 Quito Road, Saratoga, hereinafter sometimes referred to as the Quito Property;

(2) 2201 and 2215 Lafayette Street, Santa Clara, hereinafter sometimes referred to as the Lafayette Property;[6]

(3) 767 Parker Street, Santa Clara, hereinafter sometimes referred to as the Parker Property; and

(4) 1061 Richard Street, Santa Clara, hereinafter sometimes referred to as the Richard Property.

The Quito Property, the Lafayette Property, the Parker Property, and the Richard Property are hereinafter sometimes referred to collectively as the Subject Properties.

1. In General

The Subject Properties are south or southeast of the southern end of the San Francisco Bay, in Santa Clara County, the most populous county in the San Francisco Bay region. Saratoga (the Quito Property), about 10 miles west of San Jose, is a small city which is significantly more affluent than the county as a whole. Saratoga is largely a "bedroom community". Santa Clara

---

[6] The Lafayette Property consists of two contiguous properties that the parties treat as one property for valuation purposes in the instant case. See supra note 4.

City is a larger city, between Saratoga and San Jose. The other Subject Properties are in one of the older industrial districts of Santa Clara City.

2. The Quito Property

The Quito Property is 11.23 acres, about 489,178 square feet. Access to the Quito Property is available from Quito Road on the east and from Vessing Drive on the south. The Quito Property is on a slope; its eastern border closely follows a creek. The eastern and western sides of the Quito Property are irregular, the east-west distance varying from about 640 feet at the north end to about 380 feet at the south end.

The Quito Property is located in east Saratoga, in a residential neighborhood about 2-3 miles from downtown Saratoga. The Quito Property is zoned residential single family with a minimum size lot requirement of 40,000 square feet. The Quito Property's neighborhood was typified by 1-acre lots, but many lots were of various sizes up to 2.7 acres. During 1992, homes within a 1-mile radius of the Quito Property sold at prices from $506,000 to $1,175,000.

The Quito Property is in the Campbell Union School District and not the Saratoga School District. Homes located in the Saratoga School District historically received a location premium of 10 percent, compared to homes in the Campbell Union School District. Public schools and commercial services are within 5

minutes of the Quito Property. The Quito Property is improved by a wood frame and stucco residence, in which Hinz was living at decedent's death. Hinz planned to continue to use the Quito Property as his residence. By the time of decedent's death, the roof over one bedroom wing and the patio area had collapsed.

The highest and best use of the Quito Property is for residential subdivision development. Development of the Quito Property would require the removal of the existing house. Although the Quito Property is large enough for 11 or 12 minimum-size lots, because of the slope of the property and lot limitations on sloped properties, the Quito Property has the potential to be subdivided into only eight lots.

### 3. The Lafayette Property

The Lafayette Property is 10.72 acres, about 467,000 square feet. The Lafayette Property is on level land; it fronts on Lafayette Street and on Mathew Street. It consists of two adjoining parcels, each of which is oddly shaped.

In 1992, the Lafayette Property was zoned heavy industrial, which allowed manufacturing, assembling, research, wholesale, or storage uses. Other uses permitted on the Lafayette Property included light manufacturing, warehouses, laboratories, offices, and incidental retail sales.

All utilities were available to the Lafayette Property. The Lafayette Street frontage was improved with concrete curbs and

gutters, street lights, and sidewalks.  The Mathew Street
frontage was partially improved with concrete curbs and gutters.

Building improvements on the Lafayette Property included an
industrial metal building on a concrete slab foundation.[7]  The
building included 11 grade-level metal rollup truck doors and a
23-foot-wide metal canopy over a concrete apron.  The building
was used primarily for vehicle and equipment maintenance, but it
also had office space.[8]  The building was of an overall low-cost
to average construction quality with low-cost interior office
build-out.  The building was built in 1978 and, at decedent's
death, was in average condition with no significant problems.
There was also a 450-square-foot concrete block building suitable
only for storage located on the Lafayette Property.  This
concrete building was in a state of substantial disrepair and did
not contribute any net value to the overall value of the
Lafayette Property.

At decedent's death, both parcels of the Lafayette Property
were occupied by one tenant, Nelson Brothers Trucking Co.,

---

[7]     We assumed that the parties could agree on such matters as
the size of the building.  However, petitioner's expert shows the
building's site area variously as 13,200 sq. ft., 12,800 sq. ft.,
and 12,866 sq. ft., while respondent's expert shows it as 10,800
sq. ft.  Neither side has explained the difference.

[8]     Petitioner's expert states that "Office and restroom area"
was 1,638 sq. ft.  Respondent's expert states that "Office build-
out within the structure is estimated at 2,250 square feet".
Neither side has explained the difference.

hereinafter sometimes referred to as Nelson Bros.  The Nelson Bros. lease was entered into in 1976 for 10 years with two 5-year renewal options.  At decedent's death, the lease was in its final 5-year renewal period with 48 months remaining and scheduled expiration of April 30, 1996.  Under the lease, Nelson Bros. paid monthly rent of $3,500 and was responsible for all operating costs of the property, including real property taxes.

In December 1991, Nelson Bros. had one underground gasoline storage tank removed from the Lafayette Property.  After removal of the tank, Nelson Bros. had the soil tested for fuel contamination.  The test result showed unacceptable levels of fuel contamination.  On May 4, 1992, a reasonable buyer would have discovered the ground contamination and adjusted the sales price of the Lafayette Property downward by about $100,000 because of cleanup concerns.

At decedent's death, the highest and best use for the Lafayette Property was for heavy industrial usage.

### 4. The Parker Property

The Parker Property is 2.93 acres, about 127,631 square feet.  The Parker Property is on level land; it fronts on Parker Street, Lafayette Street, and Grant Street, and it adjoins the Lafayette Property on the south.  It is flag-shaped.

In 1992, the Parker Property was zoned heavy industrial, which allowed manufacturing, assembling, research wholesale, or

storage uses.  Other permitted uses included light manufacturing, warehouses, laboratories, offices, and incidental retail sales.

All utilities were available to the Parker Property.  The Parker Street frontage was partially improved with curbs, gutters, and streetlights, and the Lafayette Street frontage was improved with curbs, gutters, sidewalks, and streetlights.

The Parker Property was improved with buildings that provided office space, storage space, and shop space.[9]

At decedent's death, the Parker Property was leased to Pacific Coast Building Products, Inc. (hereinafter sometimes referred to as Pacific), a roofing company,[10] for $1,500 per month.  The original lease was for 10 years and expired on May 31, 1990.  At the expiration of the lease's initial term and at decedent's death, Pacific was holding over on a 5-year extension,

---

[9]    Petitioner's expert witness report discusses an office building (4,854 sq. ft.), a machine shop (7,200 sq. ft.), and lumber storage buildings (1,200 sq. ft.), for a total of 13,254 square feet of building improvements.  Respondent's expert witness report discusses an office building (3,058 sq. ft.) and a storage shed (5,662 sq. ft.), for a total of 8,720 square feet of building improvements.  Neither side has favored us with a reconciliation of these widely divergent descriptions or an attempt to show why that side's description is more accurate than the other side's description.

[10]    Petitioner's expert witness report states that the Parker Property was "leased to a trucking company."  Our finding that the Parker Property was leased to a roofing company is contrary to this statement in the expert witness report and is based on (1) Hinz' testimony and (2) a copy of the lease attached to the same expert witness report.

at the same rate. In 1995, at the end of the first extension, Hinz and Pacific discussed another 5-year extension. Hinz' final rental offer was $6,000 per month, which Pacific rejected. The Parker Property then remained vacant for about 7 months.

In 1984, groundwater monitoring wells were installed on the Parker Property to monitor a 1,000-gallon diesel storage tank and an 8,000-gallon gasoline storage tank. In 1985, the 1,000-gallon tank was removed. Tests of soil at the 1984 installation of the monitor well near the 1,000-gallon tank, and at the 1985 removal of the 1,000-gallon tank, did not show substantial contamination. However, tests of water samples collected in August 1993 from that monitoring well showed substantial contamination around the former diesel tank. Remediation work was performed in the latter half of 1995. No significant contamination was found near the 8,000-gallon tank, which was removed in August 1994. At decedent's death, there was soil and groundwater contamination adjacent to the former location of the 1,000-gallon tank, while the 8,000-gallon tank remained on the Parker Property with no known contamination associated with it. On May 4, 1992, a reasonable buyer would have discovered the groundwater contamination and adjusted the sales price of the Parker Property downward.

At decedent's death, the highest and best use for the Parker Property was for heavy industrial usage.

5. The Richard Property

The Richard Property is about .459 acres, 20,000 square feet.  The Richard Property is on level land; it fronts on Richard Avenue; and it is about one block north and one block west of the Lafayette Property.  The Richard Property is rectangular.  The City of Santa Clara had an easement for the purpose of ingress and egress, and the installation and maintenance of sanitary and storm sewer mains and appurtenances.

In 1992, the Richard Property was zoned heavy industrial, which allowed manufacturing, assembling, research, wholesale, or storage uses.  Other permitted uses included light manufacturing, warehouses, laboratories, offices, and incidental retail sales.

All utilities were available to the Richard Property.  The frontage was improved with curbs, gutters, and streetlights.

The Richard Property was improved with a machine shop building,[11] a 300-square-foot office building, and miscellaneous storage buildings.

The Richard Property was not subject to a lease at decedent's death, and did not produce any income in 1992.  At some point in 1993 the Richard Property was leased to S.B.

---

[11]    Petitioner's expert witness report gives the area of this building as 5,470 square feet at one point and 5,440 square feet at three other points.  Respondent's expert witness report gives the area of this building as 4,940 square feet.  Neither side favors us with commentary on this 10-percent discrepancy in building size.

Machine Works and began to be used as a machine shop.  For several years thereafter, the rental was $1,500 per month.  At decedent's death, the highest and best use of the Richard Property was for heavy industrial usage.

### 6. Other Properties

The estate includes two real properties on Lafayette Street in Santa Clara, in addition to the Subject Properties.  On the estate tax return, these additional properties are shown as having an aggregate date-of-death value of $230,000.  In the notice of deficiency, respondent determined an aggregate value of $290,000.  In the amended estate tax return, the aggregate value is again shown as $230,000.  The parties have stipulated that the aggregate value of these additional properties is $220,000.

### 7.  Valuation Conclusions

Table 2 shows the positions of the parties, of their expert witnesses, and of the Court as to the fair market values of the subject properties on the date of decedent's death.

Table 2

| Petitioner: | Quito | Lafayette | Property Parker | Richard | Total value of Subject Properties |
|---|---|---|---|---|---|
| 1. Estate tax return | $2,750,000 | $3,720,000 | $1,115,000 | $300,000 | $7,885,000 |
| 2. Amended tax return | 1,315,000 | 2,170,000 | 500,000 | 225,000 | 4,210,000 |
| 3. Petition | 1,315,000 | 2,170,000 | 500,000 | 225,000 | 4,210,000 |
| 4. Expert--Atkinson | 1,750,000 | 2,850,000 | 600,000 | 200,000 | 5,400,000 |
| 5. Experts--Kidder, Kirby | – | 2,800,000 to 3,100,000 | 940,000 to 955,500 | – | N/A |
| 6. Briefs | 1,750,000 | 2,850,000 | [1]600,000 or 940,000 | 200,000 | [1]5,400,000 or 5,740,000 |
| Respondent: | | | | | |
| 7. Notice of deficiency | 3,250,000 | 4,948,000 | 1,484,000 | 400,000 | 10,082,000 |
| 8. Expert--Hulberg | 2,300,000 | 3,417,000 | 1,240,000 | 320,000 | 7,277,000 |
| 9. Expert--Hulberg (revised) | 2,300,000 | 3,960,000 | 1,460,000 | 320,000 | 8,040,000 |
| 10. Briefs | 2,300,000 | 3,960,000 | 1,460,000 | 320,000 | 8,040,000 |
| Court: | | | | | |
| 11. Ultimate findings of fact | 2,200,000 | 3,700,000 | 1,200,000 | 250,000 | 7,350,000 |

[1] At three points in petitioner's opening brief, petitioner contends that the Parker Property was worth $940,000. At one of these points, petitioner shows the total for the Subject Properties as $5,725,000. The latter amount is evidently an arithmetic error, the sum of the individual amounts contended for at that point in petitioner's brief being $5,740,000. However, at one point in petitioner's opening brief and at two points in petitioner's answering brief, petitioner contends that the Parker Property was worth $600,000. The latter valuation for the Parker Property would bring petitioner's total for the Subject Properties down to $5,400,000.

OPINION

## I. Value of Decedent's Real Property

The value of decedent's gross estate includes the fair market value of the real property that decedent owned at her death. See sec. 2031(a);[12] United States v. Cartwright, 411 U.S. 546, 551 (1973); sec. 20.2031-1(b), Estate Tax Regs.

The parties have not agreed on the fair market value of decedent's real property, and so we have to find the fair market value. See Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 451-452 (1980).

Generally, the fair market value of property is the price at which a willing buyer will purchase the property from a willing seller, when neither is acting under compulsion and both are fully informed of the relevant facts and circumstances. See, e.g., McShain v. Commissioner, 71 T.C. 998, 1004 (1979); sec. 20.2031-1(b), Estate Tax Regs. Respondent's determinations in the notice of deficiency as to the fair market values of the subject properties are presumptively correct, and petitioner has the burden of proving that the fair market values are lower. See Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). However,

---

[12]    SEC. 2031. DEFINITION OF GROSS ESTATE.

   (a) General.--The value of the gross estate of the decedent shall be determined by including to the extent provided for in this part, the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated.

we note that respondent's position on brief as to each of the Subject Properties is that the correct fair market value is less than the amount respondent determined in the notice of deficiency. Indeed, respondent is now calling for values of the Quito Property and the Lafayette Property that are almost $1 million below the amounts respondent determined in the notice of deficiency. See supra table 2. We regard these reductions from the notice of deficiency amounts as concessions by respondent. In the instant case, petitioners have the burden of proof only to the extent that petitioners contend that the correct fair market values are less than the amounts that respondent contends for on brief.

It is well settled that the valuation of an asset in a tax return is an admission by the taxpayer when that valuation is inconsistent with a later position taken by the taxpayer. See Waring v. Commissioner, 412 F.2d 800, 801 (3d Cir. 1969), affg. T.C. Memo. 1968-126; McShain v. Commissioner, 71 T.C. at 1010. It is equally well settled that such an admission is not conclusive and that the trier of fact is entitled to determine, based on all the evidence, what weight, if any, should be given to the admission. McShain v. Commissioner, supra. That is, "admission" is not here used in the binding sense of Rule 37(c), 90(f), or 91(e), but rather in the evidentiary sense of rule 801(d)(2) of the Federal Rules of Evidence. In this connection,

it is appropriate to note that on brief respondent contends that the fair market value of the Quito Property is <u>$450,000 less than the amount petitioner reported</u> on the estate tax return. See <u>supra</u> table 2.

At trial, both sides presented the testimony of expert witnesses to establish the fair market values of the Subject Properties. It would not serve any useful purpose to make a detailed analysis of the testimony of these experts to explain item by item the extent to which we agree or disagree with their analysis. Valuation is not a precise science, and the determination of the fair market value of property as of a given day is a question of fact (see <u>Kaplan v. Commissioner</u>, 43 T.C. 663, 665 (1965)), to be resolved on the basis of the entire record (see <u>McShain v. Commissioner</u>, 71 T.C. at 1004), and without necessarily being bound by the opinions of the expert witnesses. See <u>Penn v. Commissioner</u>, 219 F.2d 18, 21 (9th Cir. 1955), affg. a Memorandum Opinion of this Court. However, we do note considerations that we have taken into account in our determination and explain how we reach our conclusions. See <u>Estate of Jung v. Commissioner</u>, 101 T.C. 412, 424 (1993).

Before we proceed to our analyses of the values of the Subject Properties, it may be appropriate to briefly discuss the expert witnesses.

Petitioner's primary expert witness is Noel K. Atkinson, hereinafter sometimes referred to as Atkinson. He has been a real estate appraiser since the early 1950's. When the instant case was tried, about half of Atkinson's work was testifying in Court.

Atkinson appropriately used the comparable sales approach as a major element in valuing the land portion of each of the Subject Properties.[13] Under the comparable sales approach, if a comparable property has an element of a lesser quality than the property being appraised, then the comparable property's sale price is adjusted upward, and vice versa. Atkinson appropriately compared several different elements of the properties and generally used four to six comparables. He displayed the adjustments in a matrix, and also briefly explained why he adjusted the comparable property's sale price up or down.

---

[13] The comparable sales approach involves locating parcels of land which were as physically similar as possible to the subject property, and which had been sold within a reasonable time of decedent's death. Since no two sales and no two parcels are identical, the actual sales price in each case is then to be adjusted up or down to reflect the differences between the subject property and the comparable property. The estimated values of the comparable properties as so adjusted provide an indication of the value of the subject property on the relevant date. Like most valuation techniques, this method is far from an exact science. However, it is based upon the common sense approach of taking the actual sales prices of properties similar to the subject properties and then relating the prices to the subject properties. This Court has often used or approved the use of this valuation method. See Wolfsen Land & Cattle Co. v. Commissioner, 72 T.C. 1, 18-21 (1979).

Unfortunately, in many instances Atkinson stated that an element of a comparable property was of a lesser quality than the property being valued and then did not adjust for that lesser quality or adjusted downward.  In at least one instance, the mere correction of the directions of the adjustments in Atkinson's matrix so that they conformed to Atkinson's textual descriptions resulted in increasing the resulting value by about 50 percent.  Also, in some instances, the textual descriptions of properties in Atkinson's written report did not match the properties listed in the accompanying matrix.  It was as though Atkinson had revised parts of a draft of his report but inadvertently kept parts of former drafts that no longer fit the revised draft.

Another matter that gives us concern about how carefully Atkinson reads the expert witness reports that he issues relates to the following statement which appears in each of his valuations of the Subject Properties.  "This appraisal meets the certification requirements of the California Civil Code Section 1922.14 controlling persons preparing certified appraisals of real property."  These valuations are dated from May 10, 1995 (Lafayette Property), to February 11, 1998 (Parker Property).  At trial, Atkinson was confronted by the fact that the cited California Code provision had been repealed in 1990, the repeal taking effect no later than January 1, 1992.  Atkinson acknowledged the repeal. When asked why his expert witness report

relies on a statute that had been repealed years earlier, Atkinson replied as follows: "A  I think this is boilerplate that was put in by my secretary over the last--ever since 1992, and I have never taken it out."

As a result of the obvious errors in Atkinson's expert witness report, we are hesitant to rely on Atkinson's judgment even as to those matters that do not involve obvious errors.

Respondent's expert witness in Norman C. Hulberg, hereinafter sometimes referred to as Hulberg.  He has been a real estate appraiser since 1975.  He has testified as an expert witness "on over 50 occasions" in Federal District Courts in the San Francisco area and in Las Vegas, Nevada.

Hulberg also used the comparable sales approach on, or in connection with, his valuations.  (See, e.g., infra B. Lafayette Property, in which Hulberg used the comparable sales method only to determine the reversionary value element of the discounted-cash-flow method).  Hulberg avoided the disconnects between textual analysis and valuation adjustments that plague Atkinson's expert witness report.  He did so by (1) the simple expedient of abbreviating the textual analysis of the comparable properties, and (2) the even simpler expedient of omitting altogether the property-by-property matrix of adjustments to the comparable property sale prices.  By thus failing to reveal the details of his analysis, Hulberg protects against the pitfalls that Atkinson

fell into, but at the same time he vastly diminished the weight to be given to his conclusions. The expert witness helps the trier of fact primarily by explaining so that the trier of fact follows and understands.[14] The expert who issues pronouncements without detailing the supporting analysis does not properly satisfy this obligation and so is generally not a persuasive expert witness.[15] Hulberg's report, too, evinced failure to review before issuing. For example, Hulberg's report included more than one final value for the Lafayette Property and the Parker Property. Hulberg's report showed final values for the

---

[14]   Fed. R. Evid. 702, provides as follows:

Rule 702.   Testimony by Experts

    If scientific, technical, or other specialized knowledge <u>will assist the trier of fact</u> to understand the evidence or <u>to determine a fact in issue</u>, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. [Emphasis added.]

[15]   See 15 Mertens, Law of Federal Income Taxation, sec. 59.08, at 22 (1999).

    A common fallacy in offering opinion evidence is to assume that the opinion is more important than the facts. To have any persuasive force, the opinion should be expressed by a person qualified in background, experience, and intelligence, and having familiarity with the property and the valuation problem involved. <u>It should also refer to all the underlying facts upon which an intelligent judgment of valuation should be based</u>. The facts must corroborate the opinion, or the opinion will be discounted. [Fn. ref. omitted; emphasis added.]

Lafayette Property of $3,417,000, $3,960,000, and $3,618,000, and for the Parker Property of $1,468,000 and $1,240,000.

As a result of the foregoing, we have qualms about relying on Hulberg's judgments even as to those matters that do not involve obvious errors.

Petitioner also presented the testimony of W. Jack Kidder, hereinafter sometimes referred to as Kidder, and John J. Kirby, hereinafter sometimes referred to as Kirby. Kidder and Kirby are hereinafter sometimes referred to jointly as Kidder/Kirby. Kidder has 37 years of experience valuing real property, and Kirby has more than 25 years of experience valuing real property. Kidder's and Kirby's testimony and report were introduced for the sole purpose of rebutting Hulberg's report and testimony with regard to the Lafayette and Parker Properties.

A. Quito Property

Both Atkinson and Hulberg valued the Quito Property using both the comparable sales approach and a second approach, which Hulberg calls the land development approach and Atkinson calls the cost approach.

Table 3 shows Atkinson's and Hulberg's conclusions as to the fair market value of the Quito Property under the different approaches.

Table 3

| Expert | Comparable Sales | Land Development or Cost | Conclusion |
|---|---|---|---|
| Atkinson (P) | $2,009,855 | $1,497,000 | $1,750,000 |
| Hulberg (R) | 2,365,000 | 2,210,000 | 2,300,000 |

Atkinson and Hulberg agree that the highest and best use of the Quito Property is for residential subdivision development, that the Quito Property should be treated as being potentially divisible into eight lots, and that any such development would require removal of the existing house on the Quito Property.

Hulberg "considered both approaches equally * * * and will reconcile toward the middle of the indicated range." Atkinson concluded that "The Cost and Sales Comparison Approaches are very close in final value"; he, too, struck a final valuation midway between the values of his two approaches. Hulberg's comparable sales approach value was only 7 percent higher than his land development approach value. Atkinson's comparable sales approach value was 34 percent higher than his cost approach value. See supra table 3. We do not understand the standards of judgment that prompted Atkinson to conclude that a 34-percent differential is "very close".

Comparable Sales Analysis

For his comparable sales analysis, Atkinson selected five sales of other properties, sold between June 1989 and December 1990, and presented a matrix showing sale-by-sale, item-by-item

adjustments. His descriptions of these sales were scattered in his expert witness report, requiring some search. These brief descriptions do not include explanations of the adjustments made in the matrix. After adjusting the sale prices on account of location, topography, etc., Atkinson arrived at an average fair market value per acre of $178,972. He multiplied that amount by 11.23 acres and arrived at an indicated value of $2,009,855 for the Quito Property.

For his comparable sales analysis, Hulberg selected six sales of other properties, sold between March 1988 and November 1995. Although Hulberg stated in his report that in making his adjustments to the comparable properties' sale prices, he "considered access, site influences, school district attendance areas, site development costs, favorable financing and overall neighborhood aesthetics", he did not favor us with information as to how much of an adjustment he made to any comparable property's sale price, and why. He chose to compute price per lot, rather than per acre. Hulberg was "inclined to value the subject at the lower end of the indicated valuation range" and informed us that this inclination led him to a value of $300,000 per lot. Because the Quito Property could be subdivided into eight lots, Hulberg came to a valuation of $2.4 million. From this, he subtracted $35,000 to demolish the building on the Quito Property, resulting in a net comparable sales approach value of $2,365,000.

Neither expert used a comparable sale that the other one did. Neither expert gave us a cogent reason to conclude that his selection of comparable properties' sales was better than the other's, that his adjustments were better than the other's, or that a per-lot computation, was better than a per-acre computation, or vice versa.

Cost or Land Development Analysis

As best we can tell, what Atkinson describes as the "Cost Approach" is essentially similar to what Hulberg describes as the "Land Development Approach". Both Atkinson and Hulberg used, in their cost or land development analysis, sets of comparable property sales that were different from the comparable property sales they used in the basic comparable sales analysis.

Atkinson's expert witness report states that

> I have selected $400,000 per lot for eight lots [the number of residential lots that both sides agree the Quito Property would probably be subdivided into] as being a reasonable retail lot value due to the location and the 18 to 24 months it would take to have the lots ready to sell.

Atkinson's expert witness report then goes on to state that the indicated value by this approach is $1,497,000. Atkinson's expert witness report does not explain, or even briefly describe, the process by which he moved from $3,200,000 ($400,000 per lot for eight lots) to an indicated value of $1,497,000.

At trial, on direct examination, Atkinson attacked Hulberg's valuation of the Quito Property and contrasted it with his choice

of $400,000 per lot. However, the next morning, on redirect examination, Atkinson testified that $400,000 per lot was "a typographical error." Prompted by petitioner's counsel, Atkinson then testified that the value should have been $300,000 per lot. The Court then received into evidence Atkinson's notes that show how he moved from $2,400,000 ($300,000 per lot for eight lots) to an indicated value of $1,208,000. Atkinson's notes as so admitted conclude with the following: "13. I arbitrarily selected a higher cost figure as I felt lots would sell at a higher Price."

Atkinson's flip-flops and self-confessed arbitrariness convince us that we should not give any weight to his conclusion that the Quito Property's indicated value under the cost approach is $1,497,000; they also seriously undermine our willingness to pay attention to his valuations of any of the Subject Properties. We also view with some concern petitioner's counsel's presentation of Atkinson's expert witness report with the $400,000-per-lot analysis, petitioner's counsel's supportive questioning regarding Atkinson's direct examination's defense of $400,000 per lot, and then Atkinson's overnight conversion being prompted by petitioner's counsel.

Hulberg's land development approach has some similarities to, and some differences from, Atkinson's cost approach.

Hulberg concluded that the eight lots into which a developer would subdivide the Quito Property would be sellable by the developer for $500,000 per lot.

Both Atkinson and Hulberg concluded that the prospective developer would expect to make a $50,000 profit per lot, or $400,000 for the entire Quito Property.

In his admitted notes, Atkinson lists various costs that the developer might be expected to incur, in addition to the expected profit; these costs, which include several items calculated as a percentage of gross, aggregate 33 percent of the $300,000 per lot gross. Hulberg, in his expert report, has a similar but more sophisticated elaboration of developer costs, which aggregate 34-7/8 percent of the $500,000 per lot gross. Hulberg's elaboration of costs is somewhat greater in amount and in percentage-of-gross than the list in Atkinson's notes. Accordingly, the substantial difference between Atkinson's $1,497,000 cost approach amount and Hulberg's $2,210,000 land development approach is attributable to their differing estimates of the price a developer could get for each of the eight lots into which the Quito Property would be subdivided.

Hulberg also does not set out the adjustment process; however, he provides information about the terrains of the comparable properties. His comparable properties average $587,000 per lot. When we make adjustments based on his terrain

descriptions, we arrive at an average of about $500,000 per lot, the amount that Hulberg used.

The Quito Property is in the Campbell Union School District and not the Saratoga School District. Atkinson and Hulberg agree that homes in the Saratoga School District command a market premium compared to homes in the Campbell Union School District. Accordingly, if any of the comparables are in the Saratoga School District, then their sale prices should be adjusted downward. However, we have not found, and petitioner has not directed our attention to, anything in the record that shows that any of the Hulberg's comparables were in the Saratoga School District or in any other school district where residential property prices were higher than the Campbell Union School District. Neither side has presented to the Court cogent reasons why the Court should disregard any of the comparable properties presented by Atkinson or by Hulberg.

We note that two of the comparable properties appear on both Atkinson's and Hulberg's lists--the property at 15425 Monte Vista Dr., which was sold in May 1992 for $675,000, and the 1.16-acre property at lot 16, Sobey Oaks Court, which was sold in July 1991 for $550,000. We note further that Atkinson shows the Monte Vista Dr. property as being 2.9 acres, Hulberg shows this Monte Vista Dr. property as being 2.0 acres. Neither side pointed out the discrepancy at trial or on brief, and neither expert witness'

report provides information from which we could come to a conclusion as to what is the area of this Monte Vista Dr. property.

Conclusion

Doing the best we can on the basis of the record made by the parties, taking into account our above-expressed reactions to Atkinson's cost analysis, we conclude, and we have found, that the date-of-death fair market value of the Quito Property is $2.2 million.

B. Lafayette Property

Atkinson valued the Lafayette Property using three approaches: (1) The comparable sales approach, (2) the income approach, and (3) the cost approach. Under the latter two approaches, Atkinson valued the land component of the Lafayette Property using the comparable sales approach.

Hulberg and Kidder/Kirby valued the Lafayette Property using the discounted cash-flow approach. In determining the reversionary value element of the discounted cash-flow approach, Hulberg and Kidder/Kirby used the comparable sales approach.

Table 4 shows Atkinson's, Hulberg's, and Kidder/Kirby's valuations of the Lafayette Property under their respective approaches.

Table 4

| Expert | Approach--Amount | | Conclusion |
|---|---|---|---|
| Atkinson (P) | Comparable sales | $2,892,000 | |
| | Income | 2,822,000 | |
| | Cost | 3,023,000 | |
| | | | $2,850,000 |
| Hulberg (R) | Discounted cash-flow | | [1]3,960,000 |
| Kidder/Kirby (P) | Discounted cash-flow | | 2,800,000-<br>3,100,000 |

[1] In his expert witness report, Hulberg states his conclusion at different places as (1) $3,417,000, (2) $3,960,000, and (3) $3,618,000. Hulberg's analysis goes only to the $3,960,000. It appears that the other numbers are the remains of earlier drafts, which Hulberg neglected to conform to the results of his later analyses.

Atkinson values the Lafayette Property as a fee, ignoring the then-existing lease. Hulberg and Kidder/Kirby value the Lafayette Property subject to the lease, a circumstance that pushes them toward the discounted cash-flow approach. Each expert uses a comparable sales approach at some point in his analysis. Atkinson and Hulberg reduce their valuations to take into account environment contamination considerations.

In his comparable sales analysis, Atkinson separately valued (1) "the structure and its minimum site"[16] and (2) "the excess land". Table 5 shows his conclusions.

Table 5

| Item | Value |
|---|---|
| Improvements with 67,000 sq. ft. site area,[1] 12,800 sq. ft. bldg. area @ $30 per sq. ft. | $384,000 |
| Excess land 400,000 sq. ft. @ $6.60 per sq. ft. | 2,640,000 |
| Contamination considerations | (132,000) |
| | 2,892,000 |

[1] The value is calculated as the product of the building area and the price per square foot; it is not affected by the 67,000-square-foot site area.

In his analysis of the excess land, Atkinson selected six sales of other properties, briefly described these other properties, and presented a matrix showing adjustments up or down in order to reflect differences between the other properties and their sales, on the one hand, and the Lafayette Property and its status on the date of decedent's death, on the other hand. He made adjustments for differences on account of location, size, accessibility to rail facilities, traffic exposure, street

[16] Atkinson does not explain his concept of "minimum site" and his choice of 67,000 square feet. However, our examination of the assessor plat map in his expert witness report suggests that 67,000 square feet may be the approximate area of that part of the Lafayette Property from the frontage on Mathew Street to the rear of the building.

improvements, and parking and utilities. Unlike the corresponding portion of his report as to the Quito Property, see supra, Atkinson provided a brief explanation of why he made each of the matrix adjustments to the Lafayette Property comparable sales.

Atkinson's matrix contains 36 entries, of which 25 are other than zero. In the case of 14 of these nonzero entries, Atkinson stated that the comparable property is inferior to the Lafayette Property but he made a downward adjustment to the comparable property's sale price.[17] Atkinson used his matrix to conclude that the 400,000 square feet of "excess land" should be valued at $6.60 per square foot, leading to a value of $2,640,000 for this component of the Lafayette Property. If we were to accept Atkinson's choices of comparable sales and Atkinson's evaluations of the characteristics of the comparable properties, but correct the direction of the adjustments, then the 400,000 square feet of "excess land" should be valued at $9.20 per square foot, leading to a value of $3,680,000 for this component of the Lafayette Property.

Atkinson used the "excess land fair market value" of $2,640,000 directly in his income approach and the "land value

---

[17] As explained in the text at supra note 13, if the comparable property has an element that is inferior to the property being appraised, then the comparable property's sale price is to be adjusted upward.

from market analysis" of $3,082,200 ($6.60/sq. ft. x 467,000 sq. ft.) directly in his cost approach.  Table 6 shows Atkinson's three valuation approaches as he reported them (supra table 4), and as they would be if adjusted to take account of the directional (i.e., plus versus minus) errors Atkinson makes in his matrix, without changing the size of each adjustment.

Table 6

| Approach | Atkinson's Report | Amount Corrected |
| --- | --- | --- |
| Comparable Sales | $2,892,000 | $3,932,000 |
| Income | 2,822,000 | 3,862,000 |
| Cost | 3,023,000 | 4,465,200 |

A significant defect in all of Atkinson's approaches is that he did not give adequate consideration to the fact that the then-present lease term had 3 years to run.  As a result, the property should have been valued as a leased fee.  Hulberg and Kidder/Kirby agreed that leased fee was the proper status of the Lafayette Property.  They agreed that the discounted cash-flow approach was the best way to value the Lafayette Property.  With the then-current lease apparently being at below-market rates, the discounted cash-flow approach overlay on Atkinson's work would lead to a valuation less than the $4 million or more that might have been supported by the corrections embodied supra in table 6.

Hulberg broke the Lafayette Property into its two original components.  See supra note 4.  He valued the fee interest in one

portion, based on comparable sales, at $10.50 per square foot, and the other portion (the portion with the building) at $11.50 per square foot. Hulberg totaled the two portions and arrived at a fee interest value of $5,188,000.[18] This averages $11.10 per square foot. All of Hulberg's comparable sales were of properties smaller than the Lafayette Property. Hulberg's expert witness report makes a downward adjustment in each comparable property's sales price (in an amount that Hulberg failed to disclose) to account for the phenomenon that, at those sizes in that market, smaller properties were worth more per square foot than otherwise equivalent larger properties. At trial, Hulberg presented adequate rebuttals to the Kidder/Kirby attacks on many of the elements of Hulberg's analysis.

However, we remain troubled by Hulberg's failure to guide us through his decision-making process, as described in the opinion text at supra note 14. Also, we are unwilling to accept Hulberg's explanation at trial that his shift from $3,417,000 and $3,618,000 valuation conclusions to his final valuation of $3,960,000 was entirely the result of his shifting view of the impact of environmental concerns. We have not found in the record anything that would lead us to believe that Hulberg really

---

[18] First portion: 179,903 sq. ft. x $10.50 per sq. ft. = $1,889,000. Second portion: 286,886 sq. ft. x $11.50 per sq. ft. = $3,299.000.

thought that environmental concerns would drive the value of the Lafayette Property down in the market by $600,000.[19]

Doing the best we can with a record that, although fairly extensive is also fairly murky, we conclude, and we have found, that the fair market value of the Lafayette Property on the date of decedent's death was $3.7 million.

C.  Parker Property

Atkinson valued the Parker Property using three approaches: (1) The comparable sales approach; (2) the income approach; and (3) the cost approach.  Under the latter two approaches, Atkinson valued the land component of the Parker Property using the comparable sales approach.

Hulberg valued the Parker Property using the comparable sales approach and the income approach.  He considered, but rejected, the cost approach.[20]

---

[19]   Hulberg valued the Lafayette Property at $4,020,000.  He then subtracted $60,000 for environmental concerns to arrive at his final valuation of $3,960,000.  To go from $4,020,000 to his earlier-stated final valuation of $3,417,000, he would have had to attribute $603,000 to environmental concerns.  Atkinson's estimate of the impact of environmental concerns was only $132,000.

[20]   Hulberg gives the following reasoning for rejecting the cost approach for the Parker Property.

The cost approach is not considered to be an applicable approach for older buildings such as the subject property.  This is due to a number of factors, the most important being the lack of support for a detailed estimate of the depreciation, and lack of knowledge of the exact condition of the property as of our valuation

(continued...)

Kidder/Kirby valued the Parker Property using the discounted cash-flow approach. In determining the reversionary value element of the discounted cash-flow approach, Kidder/Kirby used the comparable sales approach.

Table 7 shows Atkinson's, Hulberg's, and Kidder/Kirby's valuation of the Parker Property under their respective approaches.

Table 7

| Approach | Atkinson | Hulberg | Kidder/Kirby |
|---|---|---|---|
| Comparable sales | $665,300 | $1,468,000 | -- |
| Income | 462,000 | 1,448,000 | -- |
| Cost | 803,500 | -- | -- |
| Discounted cash-flow | -- | -- | $940,000 to 995,500 |
| Conclusion | 600,000 | 1,460,000 | 940,000 to 995,000 |

Atkinson made many of the same errors in valuing the Parker Property as he did with the Lafayette Property. Hulberg relied on one such error.

In his income approach, Hulberg treated the tenant on the Parker Property as "holding over on a month-to-month tenancy." He based this on Atkinson's report, which does indeed make this

---

[20](...continued)
date. In addition, potential purchasers of older properties rarely, if ever, estimate the value of potential purchases utilizing the depreciated cost method; purchasers for similar properties typically consider only the market and income approaches. When the cost approach is used, it is typically used to ascertain the feasibility of new construction.

statement.  The lease, attached to Atkinson's report, provides that "Any holding over after the expiration of the said terms, [May 31, 1990] with the consent of the Lessor, shall be construed to be a tenancy from month to month".  Accordingly, Hulberg ignored the then-existing tenancy, proceeded to determine market rentals and lessor's expenses, and concluded that the market would have produced a net operating income of $101,346 per year.  He capitalized this at 7 percent and came to a valuation of $1,448,000 by the income approach.

However, the lease on the Parker Property also provides that the lessee has two options to renew for consecutive 5-year terms, at rentals to be agreed upon by lessee and lessor.  Hinz testified that the first option to renew had been exercised and the lessee was still paying $1,500 per month at decedent's death.  At the end of this renewal term (May 31, 1995), the tenant balked at Hinz's proposal to increase the monthly rental to $6,000, and moved out.  Hinz's testimony is believable, is supported by evidence of actual receipts from the Parker Property for 1992 through 1997, and was not contradicted by any evidence of record.  We have so found.  Thus, at decedent's death, the Parker Property was going to produce no more than $18,000 per year ($1,500 per month) for the next three years, notwithstanding Hulberg's estimate of market net operating income of $101,346 per year.  If Hulberg's estimates as to other elements of value are correct,

then his conclusion as to date-of-death value should be reduced by about $250,000 to reflect the expectation of 3 years (decedent died on May 4, 1992; the lease renewal term expired on May 31, 1995) of below-market rental income.

The Parker Property immediately adjoins the Lafayette Property. In substantially all respects, the Parker Property's value indicia are the same as those of the Lafayette Property. Compare our findings of fact as to the Lafayette Property with those as to the Parker Property supra. The Parker Property is about 27.3 percent the size of the Lafayette Property. Because smaller properties in that area were worth more per square foot than larger properties, we conclude that the Parker Property was worth more than 27.3 percent of the value of the Lafayette Property. The then-current rent under the Parker Property lease was about 40 percent as much as the then-current rent under the Lafayette Property lease, another factor nudging upward the value of the Parker Property. Also, the building improvements on the Parker Property were about as large as those on the Lafayette Property. Under these circumstances, we believe it is not fruitful to set forth in any greater detail the concerns we have as to the experts' presentations.

We conclude, and we have found, that the fair market value of the Parker Property on the date of decedent's death was $1.2 million.

D.  Richard Property

Atkinson valued the Richard Property using three approaches:
(1) The comparable sales approach, (2) the income approach, and
(3) the cost approach.  Under the cost approach, Atkinson valued
the land component of the Richard Property using the comparable
sales approach.

Hulberg valued the Richard Property using the comparable
sales approach and the income approach.  He considered, but
rejected, the cost approach for the same reasons he gave with
respect to the Parker Property.  See supra note 19.

Table 8 shows Atkinson's and Hulberg's valuations of the
Richard Property under their respective approaches.

Table 8

| Approach | Atkinson | Hulberg |
|---|---|---|
| Comparable sales | $223,860 | $321,000 |
| Income | 190,000 | 301,000 |
| Cost | 221,000 | -- |
| Conclusion | 200,000 | 320,000 |

In their comparable sales approaches both Atkinson and
Hulberg valued the Richard Property solely by reference to the
floor area of the machine shop building, and not by reference to
the total area of the property.  Atkinson concluded that the
Richard Property should be valued at $39 per square foot of floor
area in the machine shop building; Hulberg concluded $65 per
square foot.  Atkinson also valued the Richard Property by

reference to its total lot area ($8 per square foot), but only as one element in his cost approach.

Again, Atkinson's expert witness report descriptions of his comparable properties conflict with the matrices that he presents in order to quantify his observations.  Again, Hulberg avoided Atkinson's error by not presenting any adjustment matrix.

Hulberg makes the following point:

> In correlating these comparable sales to the subject property, the primary characteristic difference requiring consideration is the floor area ratio of the comparables in relation to that of the subject.  Floor area ratio (FAR) is the ratio of building area to site size.  It is calculated by dividing the building size by the site size.  The subject property has a floor area ratio of 25 percent.  The floor area ratios exhibited by the comparable sales vary widely between 18 percent and 69 percent.  Typically, an inverse relationship exists between floor area ratio and the overall value of the property expressed as a price per square foot of building area.

Intuitively, we agree with Hulberg's observation. Obviously, all other matters being equal, we would expect that the Richard Property (20,000 sq. ft.) would be worth more if the machine shop building stood on a 1-acre lot and would be worth less if the building stood on a quarter-acre lot.  Curiously, both Atkinson and Hulberg focused on comparable properties where the floor area ratio was 2 to 3 times that of the Richard Property.  Hulberg states that the floor area ratio is "The primary characteristic difference dominating the adjustments made to these comparables".  Atkinson appears to have ignored this

matter.  Although we are persuaded that the prices of all five of Atkinson's comparable properties and of four of Hulberg's five comparable properties should be adjusted upward because of the floor area ratio, neither side's expert helps us to decide the magnitude of this adjustment.

The income method valuations of the Richard Property constitute another setting in which the state of the record makes our task difficult.  Hulberg states that the Richard Property was leased to a tenant as of the valuation date.  Hulberg states that he asked for, but did not receive, a copy of the lease.  Accordingly, Hulberg says, he valued the Richard Property without regard to the lease, but warned that

> The value of the leased fee interest in the property
> could be the same, greater than, or less than the value
> of the fee simple interest, depending on the terms of
> the lease in effect as of the date of our valuation.

Atkinson says that "Although [the] lease had expired the rental had been extended on a month to month basis for the same rent." On brief, petitioner asks us to find as follows:

> d.  <u>Valuation of Richard Avenue Property.</u>  This
> property was subject to a legally enforceable lease
> with S.B. Machine Works (Transcript, p. 42) and the
> rent it yielded was $1,500 and any valuation by
> capitalization of income should reflect this income
> figure.  (Petitioner's Exihibit [sic] 18).

The reference to transcript, p. 42, is to Hinz's testimony, as follows:

> Q [Doyle]  And how--and was--at the time of your
> mother's death, was it rented to someone?

A [Hinz]   Yes, sir.

Q   And who was it rented to?

A   S.B. Machine Works.

Q   Okay.   And how much rent did S.B. Machine Works pay?

A   At that time?

Q   Yes.

A   Five hundred and fifty dollars a month.

Q   Okay.   And did they have a lease?

A   I'm a little hazy on that.   Their lease expired somewhere in '92 or '93.   They were on month to month for a period of time, and just when that happened, the best -- the best record I have of that is that they paid $550 a month for the month of September '93 or August '93, somewhere in there, and the next month they paid 1500.

On brief, petitioner also relies on Exhibit 18.   That exhibit shows that the Richard Property did not produce any income at all in 1992, the year of decedent's death.   Finally, neither side produced any lease for the Richard Property, and neither side called any witness who could give us any evidence about any lease that was clearer than Hinz' "hazy" recollection.

The sources petitioner relies on convince us, and we have found, that the facts are just the opposite of what petitioner asks us to find.

In that portion of his expert witness report that deals with the income approach to valuing the Richard Property, Hulberg presents a map showing the locations of the Richard Property and

the six rental comparable properties.  The map shows that comparable property 6 is far closer to the Richard Property than is any of the other five rental comparable properties.  However, Hulberg's chart and other descriptive materials do not refer to property 6.  Hulberg does not enlighten us as to the characteristics of property 6 or why he shows it on the map, given that he does not take property 6 into account in this evaluation.

Hulberg concluded that a prospective buyer of the Richard Property would be able to lease it for a gross rental of $26,676 per year, with net operating income of $24,075 per year.  As we have noted, petitioner and decedent did not receive any 1992 rental income from the Richard Property.  The Richard Property produced for 1993 $10,400 income and $3,851 expenses; for 1994 $18,000 income and $2,186 expenses.  Application of Hulberg's capitalization analysis to petitioner's actual rental results for these 2 years would lead to an income approach fair market value of about $200,000, essentially similar to Atkinson's income approach's $190,000.  See supra table 8.

As noted, Hulberg rejected the cost approach for the Richard Property.  Although Atkinson used the cost approach, he gave little weight to it because the other approaches "are the most reliable as they represent verifiable market data."

As the foregoing shows, the work of the experts in the instant case does not give us confidence in their analyses and also does not lead us to any clear conclusion. We are satisfied that the fair market value of the Richard Property is significantly more than Atkinson's $200,000 and significantly less than Hulberg's $320,000.

Doing the best we can with the record presented by the parties in the instant case, we conclude, and we have found, that the date-of-death fair market value of the Richard Property was $250,000.

E.  Conclusion

As table 2 supra shows, we conclude that the aggregate fair market value of the four disputed properties is $7,350,000. This is $535,000 less than petitioner reported on the estate tax return, $2,732,000 less than respondent determined in the notice of deficiency, and $3,140,000 more than petitioner asserted in the petition.

Based on our conclusions, the Christy-Hinz initial slap-dash valuations were far better than the work product that anyone--whether party or expert witness--produced once the parties got into their confrontational mode.

We now proceed to consider the additions to tax.

## II.  Late Filing Addition--Sec. 6651(a)(1)

The estate tax return was due by February 4, 1993. Petitioner requested an extension to July 31, 1993.  Respondent granted an extension to August 4, 1993.  See supra table 1.  The tax return was received by respondent on February 4, 1994.  Thus, the tax return was not timely filed.  At the time of filing the tax return, both Hinz and Christy thought that petitioner had been granted a filing extension to February 4, 1994, and that the filing was timely.

Petitioner contends that its failure to timely file the tax return was due to reasonable cause and not due to willful neglect because (1) Hinz, as executor, relied on Christy's erroneous advice that respondent had extended the filing period to February 4, 1994, and (2) the late filing was due to extraordinary circumstances--confusing and illegible extension dates by respondent combined with Christy's then-unsuspected eye disease.[21]

---

[21] Petitioner does not contend, in the alternative, that the amount of any addition to tax for failure to timely file the estate tax return should be less than 25 percent because the tax return was not filed more than 4 months late or because of the interplay of paragraphs (1) and (2) of sec. 6651(a).  See sec. 6651(c)(1).  As a result, we do not consider any such issue. However, we treat as implicit in the pleadings, and petitioner notes on opening brief, the alternative computational contention that the amount of the sec. 6651(a)(1) addition to tax should take into account any reduction in the amount of the deficiency resulting from the parties' settled issues and our determinations under Issue I, supra.  This computation shall be made under Rule
(continued...)

Respondent maintains that Hinz relied on Christy to file the tax return on time, that this was an attempt to delegate a nondelegable duty, and that this does not constitute reasonable cause for failing to timely file the tax return. Respondent contends that, "additionally, it was not reasonable for Mr. Christy to believe that the estate had been granted an extension to file the Federal estate tax return until February 4, 1994".

Both sides rely on the opinion of the Supreme Court in United States v. Boyle, 469 U.S. 241 (1985). Respondent stresses the focus of the Court in Boyle on the executor's duty to timely file the estate tax return. Petitioner points to the Supreme Court's ratification through Boyle of judicial holdings that reliance on counsel's advice constitutes reasonable cause, and contends that Hinz relied on Christy's advice and that Hinz did not delegate to Christy the duty of timely filing. Respondent contends that Hinz delegated the duty to Christy and did not merely rely on Christy's advice.

We agree with respondent's conclusion and with some of respondent's analysis.

---

[21](...continued)
155.

Section 6651(a)(1)[22] imposes an addition to tax of 5 percent per month (with a maximum of 25 percent) in case of failure to file a timely tax return, unless it is shown that this failure is due to reasonable cause and not due to willful neglect.

Petitioner has the burden of proving error in respondent's determination that this addition to tax should be imposed against the estate. See Church of Scientology of California v. Commissioner, 823 F.2d 1310, 1322 (9th Cir. 1987), affg. 83 T.C.

---

[22]     Sec. 6651(a) provides, in pertinent part, as follows:

SEC. 6651.   FAILURE TO FILE TAX RETURN OR TO PAY TAX.

(a) Addition to the Tax.--In case of failure--

(1) to file any return required under authority of subchapter A of chapter 61 * * * on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate;

(2) to pay the amount shown as tax on any return specified in paragraph (1) on or before the date prescribed for payment of such tax (determined with regard to any extension of time for payment), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount shown as tax on such return 0.5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 0.5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate;

381, 526 (1984); Ehrlich v. Commissioner, 31 T.C. 536, 540 (1958). In the instant case petitioner has the burden of proving that the failure to timely file the estate tax return was due to reasonable cause and not due to willful neglect. See supra note 22. United States v. Boyle, 469 U.S. at 245; Funk v. Commissioner, 687 F.2d 264, 266 (8th Cir. 1982), affg. T.C. Memo. 1981-506; Davis v. Commissioner, 81 T.C. 806, 820 (1983), affd. without published opinion 767 F.2d 931 (9th Cir. 1985). The Supreme Court has characterized this as a "heavy burden." United States v. Boyle, 469 U.S. at 245.

A taxpayer's failure to file timely is due to "reasonable cause" if the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time. See United States v. Boyle, 469 U.S. at 246; Estate of Paxton v. Commissioner, 86 T.C. 785, 819 (1986); sec. 301.6651-1(c)(1), Proced. & Admin. Regs. "Willful neglect" is defined as "a conscious, intentional failure or reckless indifference." United States v. Boyle, 469 U.S. at 245.

We conclude that petitioner is liable for an addition to tax for failure to timely file the tax return, for two reasons.

(1) By the time Christy told Hinz that the tax return due date was February 4, 1994, the true due date (Aug. 4, 1983) had already passed.

(2) Hinz did not merely retain Christy to give legal advice as to the due date of the tax return, but rather attempted to delegate to Christy the task of filing a timely tax return.

Each of these reasons is by itself sufficient to require a holding for respondent on this issue.

A. The Tax Return Was Already Late.

Under section 6651(a)(1), petitioner is liable for the late filing addition to tax "unless it is shown that such failure [to timely file the tax return] is due to reasonable cause and not due to willful neglect". (Emphasis added).

Petitioner maintains that the "reasonable cause" is Christy's advice to Hinz that the tax return's filing due date was February 4, 1994. Hinz testified that Christy first told him of the February 4, 1994, due date when Christy "kind of hustled me up as far as getting appraisals". By that time, Hinz testified they "had very little choice but to use the probate referee's figures".

From this we conclude that, when Christy gave his erroneous advice to Hinz, relatively little time remained before February 4, 1994, and thus, that August 4, 1993, had already passed. We have so found. It follows that Hinz's failure to timely file the tax return by August 4, 1993, was not "due to" Christy's misinforming Hinz.

Because (a) both of petitioner's reasonable cause contentions are based on Christy's misinforming Hinz, and (b) we have concluded that petitioner's failure to timely file the tax return was not due to Christy's misinforming Hinz, we conclude that (c) petitioner's failure to timely file the tax return was not due to reasonable cause.

B. Which Side of the Boyle "Bright Line"?

In United States v. Boyle, 469 U.S. 241 (1985), Boyle, as executor of his mother's estate, retained Keyser to serve as attorney for the estate. Boyle--

> relied on Keyser for instruction and guidance. He cooperated fully with his attorney and provided Keyser with all relevant information and records. Respondent [i.e., Boyle] and his wife contacted Keyser a number of times during the spring and summer of 1979 to inquire about the progress of the proceedings and the preparation of the tax return; they were assured that they would be notified when the return was due and that the return would be filed "in plenty of time." App. 39. When respondent called Keyser on September 6, 1979, he learned for the first time that the return was by then overdue. Apparently, Keyser had overlooked the matter because of a clerical oversight in omitting the filing date from Keyser's master calendar. Respondent met with Keyser on September 11, and the return was filed on September 13, three months late.

United States v. Boyle, Id. at 242-243.

In Boyle, the Supreme Court focused on the language of section 6651(a)(1) and section 301.6651-1(c)(1), Income Tax Regs., and noted the variety of conclusions that Courts of Appeals had come to as to when a taxpayer's reliance on a tax adviser may constitute reasonable cause. See id. at 247-248. As

to failure to file a timely estate return, the Supreme Court concluded that "The time has come for a rule with as 'bright' a line as can be drawn consistent with the statute and implementing regulations." (Fn. ref. omitted.) Id. at 248. The Supreme Court stated that reliance "on the erroneous advice of counsel concerning a question of law", such as advice "that it was unnecessary to file a return * * * may constitute reasonable cause for failure to file a return." Id. at 250. But the Supreme Court concluded that Boyle had not relied on Keyser's legal advice but had, as a practical matter, delegated to Keyser the duty of seeing to it that the estate tax return was filed timely. The Supreme Court ended its opinion as follows, id. at 252:

> It requires no special training or effort to ascertain a deadline and make sure that it is met. The failure to make a timely filing of a tax return is not excused by the taxpayer's reliance on an agent, and such reliance is not "reasonable cause" for a late filing under §6651(a)(1). The judgment of the Court of Appeals is reversed.

In Estate of La Meres v. Commissioner, 98 T.C. 294 (1992), we reached the opposite result, based on the facts there of record. In Estate of La Meres the estate's personal representative retained a lawyer as counsel to the estate. The personal representative knew when the estate tax return was originally due. When the original due date approached and appraisals were not ready, the personal representative consulted

the lawyer, who advised her to apply for a 6-month extension. The personal representative filed the proper form, together with a $20,000 check. The IRS negotiated the check and approved the request, but failed to notify the personal representative that the request had been approved, until about 2 years later. When the extended due date approached and the personal representative still had not assembled all the necessary information, she again consulted the lawyer, who again advised her to apply for a 6-month extension. Again, the personal representative filed the proper form, this time together with a $50,000 check. Again, the IRS negotiated the check. This time, the IRS denied the extension request, but again failed to notify the personal representative until about 2 years later. See id. at 304-306. Under the last sentence of section 20.6081-1(a), Estate Tax Regs., the first 6-month extension used up all the permitted extension time, and so the lawyer's advice to file a request for a second 6-month extension was based on an error of law. See id. at 320-321, 324. If the second extension request could have been granted and had been granted (as the personal representative thought was the case), then the estate tax return filing would have been timely. See id. at 306. We concluded that the personal representative reasonably relied on erroneous advice from the estate's lawyer, this reliance caused the filing of the estate tax return to be untimely, and thus the failure to timely

file the estate tax return was due to reasonable cause.  See Id. at 324.

In the instant case, we note that Hinz did not ask Christy whether the requested extension was approved and what was the new due date.  Hinz merely let time pass until Christy finally got in touch with him.  Christy did not understand that his task was merely that of legal adviser--he did not promptly notify Hinz, and, when he did get around to notifying Hinz, he did not bother to send a copy of the returned Form 4768 to Hinz.  The foregoing leads us to conclude, and we have found, that Hinz delegated to Christy the task of filing a timely tax return, precisely the wrong side of the Boyle "bright line".

We have examined the original Form 4768 in light of petitioner's contention, and Christy's testimony, that Christy's misunderstanding of the due date was due to the combination of respondent's alleged sloppiness and Christy's diminishing eyesight.  We can see why Christy might well have been puzzled by certain of the notations on the returned Form 4768, some of the notations being quite faint or otherwise unclear.  However, we do not see how any reasonable interpretation of the notations would lead anyone to conclude that (1) the approved extended due dates were the same for both filing and paying, or (2) the approved extended due date for filing was in 1994.  Apparently, petitioner means to suggest that Hinz's failure to file timely should be

excused because respondent contributed to Christy's misunderstanding, and so Christy's misunderstanding was reasonable. We do not believe that Christy's misunderstanding was reasonable. We do not believe that respondent's failure to respond more clearly and legibly[23] contributed to Christy's misunderstanding. And we do not believe petitioner's failure to timely file the tax return was due to reasonable cause.

We hold for respondent on this issue.[24] See supra note 21.

### III. Late Payment Addition--Secs. 6651(a)(2) and 6166

Section 6651(a)(2) imposes an addition to tax of 0.5 percent per month (with a maximum of 25 percent) in case of failure to pay the amount shown as tax on the tax return on or before the date prescribed for the payment of the tax, taking into account any extension of time for payment, unless it is shown that this

[23] On opening brief respondent states in two places that "the Form 4768 is clearly stamped in blue ink 'The Maximum Extension Allowed for Filing is Six Months.'" (Emphasis added). Respondent makes substantially the same statement on answering brief. As we have found, the stamped legend is faint on the original. The exhibit the parties initially offered is a photocopy of the estate tax return. The Form 4768 that is part of that exhibit is a photocopy of the original Form 4768. On that photocopy the stamped legend is totally illegible. Until the Court insisted that the original Form 4768 be made part of the record, the parties' respective counsels apparently were content to allow the Court to proceed on the basis of the illegible photocopy.

[24] Because we hold that petitioner did not have reasonable cause for the failure to file income tax returns, we do not need to address the question of whether the failure to file was also caused by willful neglect. See sec. 6651(a); see United States v. Boyle, 469 U.S. 241, 247-248 (1985); Jackson v. Commissioner, 86 T.C. 492, 539 (1986), affd. 864 F.2d 1521, 1528 (10th Cir. 1989).

failure is due to reasonable cause and not due to willful neglect.

Respondent granted an extension of the payment due date until February 4, 1994.  See supra table 1.  The estate tax return, which was filed on February 4, 1994, included an election to pay the estate taxes in installments as described in section 6166.

We consider first the validity of petitioner's section 6166 election, and then whether petitioner had reasonable cause for failing to pay when due the tax shown on petitioner's estate tax return.

## A. Validity of Sec. 6166 Election

Petitioner contends that it "properly elected Section 6166 deferral on what should be construed by the Court to be a timely filed return."  Respondent contends that this Court does not have jurisdiction to review respondent's determination that petitioner is not eligible for section 6166 relief, relying on Estate of Sherrod v. Commissioner, 82 T.C. 523 (1984), revd. on another issue 774 F.2d 1057 (11th Cir. 1985); Estate of Meyer v. Commissioner, 84 T.C. 560 (1985).  Petitioner acknowledges Estate of Sherrod, but urges us to follow Estate of La Meres v. Commissioner, 98 T.C. 294 (1992), in which, petitioner maintains, we "applied an administrative/equitable estoppel theory in ruling

* * * that the election was valid." Respondent argues that, if we have jurisdiction to determine the validity of the section 6166 election, then this election is not valid because it was not timely. Finally, respondent argues that, if we have jurisdiction and if the section 6166 election was timely, then petitioner "is not entitled to I.R.C. §6166 treatment because 35% of the decedent's assets were not in a closely held business." Petitioner responds to this last argument by asserting that well over 50 percent of the gross estate consisted of decedent's commercial real estate holdings.

We agree with petitioner's conclusion that we have jurisdiction in the instant case to determine the validity of petitioner's section 6166 election, but we agree with respondent's first alternative that the election is not valid because it was not timely.

(1) Jurisdiction

A predicate for imposition of the addition to tax under section 6651(a)(2), see supra note 22, is that there has been a "failure * * * to pay the amount shown as tax on any return * * * on or before the date prescribed for payment of such tax (determined with regard to any extension of time for payment)". (Emphasis added).

Under section 6166(d),[25] if a valid section 6166 election has been made, then "the provisions of this subtitle [subtitle F, including section 6651(a)(2)] shall apply as though the Secretary [or the Secretary's delegate, the Commissioner] were extending the time for payment of the tax."

Thus, in order for us to exercise our jurisdiction to determine the payment due date, for purposes of section 6651(a)(2), we must first determine whether the time for payment of the tax has been extended, under section 6166 or otherwise.

---

[25]    Sec. 6166 provides, in pertinent part, as follows:

SEC. 6166.   EXTENSION OF TIME FOR PAYMENT OF ESTATE TAX WHERE ESTATE CONSISTS LARGELY OF INTEREST IN CLOSELY HELD BUSINESS.

(a) 5-year Deferral; 10-year Installment Payment.--

(1) In general.--If the value of an interest in a closely held business which is included in determining the gross estate of a decedent who was (at the date of his death) a citizen or resident of the United States exceeds 35 percent of the adjusted gross estate, the executor may elect to pay part or all of the tax imposed by section 2001 in 2 or more (but not exceeding 10) equal installments.

*      *      *      *      *      *      *

(d) Election.--Any election under subsection (a) shall be made not later than the time prescribed by section 6075(a) for filing the return of tax imposed by section 2001 (including extensions thereof), and shall be made in such a manner as the Secretary shall by regulations prescribe.  If an election under subsection (a) is made, the provisions of this subtitle shall apply as though the Secretary were extending the time for payment of the tax.

In order to make that determination, in the context of the
instant case we must determine whether petitioner made a valid
section 6166 election.

Because our determination as to whether petitioner made a
valid section 6166 election can affect our resolution of the
parties' dispute over the section 6651(a)(2) addition to tax in
the instant case--a matter over which we have undisputed
jurisdiction[26]--it follows that we have jurisdiction to decide
the validity of the section 6166 election in the instant case.
Cf. Estate of Bell v. Commissioner, 92 T.C. 714, 721-723 (1989),
affd. on another issue 928 F.2d 901 (9th Cir. 1991).  The same
analysis has been applied to a variety of matters, including
interest on overpayments (see Winn-Dixie Stores, Inc. & Subs. v.
Commissioner, 110 T.C. 291 (1998); Estate of Baumgardner v.
Commissioner, 85 T.C. 445 (1985)), compliance with the
Administrative Procedure Act (see Redhouse v. Commissioner, 728
F.2d 1249, 1253 (9th Cir. 1984), affg. Wendland v. Commissioner,
79 T.C. 355 (1982)), review of the Commissioner's exercise of

---

[26]    See Estate of Young v. Commissioner, 81 T.C. 879 (1983),
holding this Court generally lacks jurisdiction over the sec.
6651(a)(2) addition to tax for failure to pay tax.  The Congress
believed it was appropriate for the Tax Court to have
jurisdiction over this addition to tax, and therefore amended
sec. 6214(a) in the Tax Reform Act of 1986, Pub. L. 99-514, sec.
1554(a), 100 Stat. 2754, effective for any action or proceeding
before the Tax Court which had not become final before Oct. 22,
1986.

discretion under section 6081 (see <u>Estate of Gardner v. Commissioner</u>, 82 T.C. 989, 999 (1984)), and application of the First Amendment to the Constitution; see <u>Kessler v. Commissioner</u>, 87 T.C. 1285 (1986), affd. without published opinion 838 F.2d 1215 (6th Cir. 1988) (compare 87 T.C. at 1287-1292 with 87 T.C. at 1293).

Respondent's reliance on <u>Estate of Sherrod v. Commissioner</u>, <u>supra</u>, and <u>Estate of Meyer v. Commissioner</u>, <u>supra</u>, is misplaced. In those cases we held that, under the law then in effect, we did not have jurisdiction over disputes about the validity of a section 6166 election. Our broadly stated conclusions in those two opinions were based on the matters in dispute in those two cases and the statutes in effect for those two cases. However, the statutes have changed, and, as a result, the settings of the disputes have changed. Of controlling significance in the instant case[27] is the 1986 legislation giving us jurisdiction over disputes as to the section 6651(a)(2) addition to tax, see <u>supra</u> note 22, respondent's notice of deficiency determination of

---

[27] The enactment of sec. 7479 (relating to declaratory judgment jurisdiction over certain sec. 6166 election matters) by sec. 505(a) of the Taxpayer Relief Act of 1997 (TRA 1997), Pub. L. 105-34, 111 Stat. 788, 854, also modifies the continued effectiveness of our broadly stated conclusions in <u>Estate of Sherrod v. Commissioner</u>, 82 T.C. 523 (1984), revd. on another issue 774 F.2d 1057 (11th Cir. 1985), and <u>Estate of Meyer v. Commissioner</u>, 84 T.C. 560 (1985). See <u>Estate of Heffley v. Commissioner</u>, 89 T.C. 265, 277 n.4 (1987), affd. 884 F.2d 279 (7th Cir. 1989). However, sec. 7479 applies only to estates of decedents dying after the date of enactment, Dec. 2, 1997. See TRA 1997, sec. 505(c), 111 Stat. at 855. In the instant case, decedent died on May 4, 1992. Thus, sec. 7479 does not affect the instant case.

a deficiency in that addition to tax, and petitioner's placing that determination in dispute.

We hold, for petitioner, that we have jurisdiction in the instant case to determine the validity of petitioner's section 6166 election; we now proceed to exercise that jurisdiction.

(2) Timeliness

Section 6166(d) provides that the election of deferral of payment of estate tax "<u>shall</u> be made not later than the time prescribed by section 6075(a) for filing the return of tax imposed by section 2001 (including extensions thereof)". (Emphasis added.) As explained <u>supra</u>, the section 6166 election was made with the tax return, but the tax return was not timely filed. As a result, the section 6166 election was not timely made. Because the section 6166 election was not timely made, as a matter of law, this election is not valid. See <u>Bank of the West v. Commissioner</u>, 93 T.C. 462, 473 (1989); <u>Estate of La Meres v. Commissioner</u>, 98 T.C. 294, 324 (1992).

On answering brief, petitioner states that

Petitioner demonstrated "reasonable cause" for the late filing of the Return, and therefore his IRC §6166 election to pay the Estate taxes in installments was timely and valid.

Later in that brief, petitioner stated that this Court had ruled in <u>Estate of La Meres v. Commissioner</u>, <u>supra</u>, that the section 6166 election involved in that case was valid. Petitioner misstates the law and misstates our holding. In <u>Estate of La</u>

<u>Meres v. Commissioner</u>, 98 T.C. at 324, we plainly stated as follows:

> Petitioner did not timely pay the estate tax shown on the return because it elected to defer payment under section 6166. The section 6166 election was invalid because it was made in a return which was not timely filed.

We hold, for respondent, that petitioner did not make a valid section 6166 election.[28]

B. Reasonable Cause for Late Payment

The amount of any addition to tax under section 6651(a)(2) depends on the amount shown as the liability on the estate tax return (or, if less, then the correct liability--see sec. 6651(c)(2)) and the amount paid at any time during the potentially 50-month addition period. See sec. 6651(b)(2). In light of our holdings as to the Subject Properties' values, <u>supra</u> table 2, as well as the parties' stipulations of settled issues, the correct liability is to be determined under Rule 155. The parties have not directed our attention to information in the record as to the dates and amounts of the tax payments. Thus, we are not in a position to quantify the section 6651(a)(2) dispute.

---

[28] Our holding that petitioner's sec. 6166 election is invalid because it was not timely, makes it unnecessary to rule on the parties' dispute as to whether petitioner's real estate holdings constituted "a closely held business," the value of which exceeded 35 percent of the adjusted gross estate, as required by sec. 6166(a)(1).

Nevertheless, the parties have presented the issues in such a way as to lead us to conclude that they believe that (1) if the section 6166 election was valid, then there would not be a section 6651(a)(2) addition to tax, and (2) if the section 6166 election was not valid, then there would be a section 6651(a)(2) addition to tax, unless the failure to timely pay the tax was due to reasonable cause and not willful neglect. Under these circumstances, we will ignore the other considerations that might have been dispositive, and limit ourselves to the reasonable cause issue. See Estate of Fusz v. Commissioner, 46 T.C. 214, 215 n.2 (1966).

Petitioner contends that its failure to timely pay the estate tax liability shown on its tax return was due to reasonable cause and not due to willful neglect because (1) illiquidity of the estate's assets meant that prompt payment would have resulted in "undue hardship", relying on sec. 301.6651-1, Proced. & Admin. Regs., (2) the section 6166 election was made in good faith and was untimely as "the direct result of Petitioner's reasonable reliance on his attorney's erroneous advice", and (3)--

> Petitioner did not receive any information that there were any concerns with the filing of the return until he received a letter from the IRS on March 8, 1995, more than a year after the return was filed. In addition, the IRS did not inform petitioner until September 30, 1996, that the section 6166 election was not going to be honored by the IRS.

Respondent maintains that petitioner did not have reasonable cause for the failure to pay on time because (1) the invalidity of the section 6166 election was due to Hinz's attempt to delegate a nondelegable duty to Christy, (2) petitioner has failed to show that the estate's assets were largely illiquid, and thus petitioner has failed to show undue hardship, and (3) "Petitioner misstates fact when he states that the IRS 'did not initially reject the section 6166 election.'"

We agree with petitioner's conclusion.

Before we analyze the section 6651(a)(2) reasonable cause requirements as applied to the facts of the instant case, we are impelled to note the following with respect to the parties' erroneous statements.

We have found that, by letter dated March 30, 1994, respondent informed Hinz that respondent was tentatively allowing petitioner's section 6166 election. Not until a letter dated February 6, 1995, did respondent inform Hinz that petitioner's section 6166 election was invalid because it was untimely. Thus (a) respondent errs in denying that respondent did not initially reject the section 6166 election--for about 10 months, petitioner operated under respondent's tentative acceptance of the election; and (b) petitioner errs in asserting that the IRS did not inform petitioner of the election's denial until September 30, 1996--

respondent had informed Hinz of the denial almost 19 months earlier.

We proceed to the merits.

A taxpayer's failure to pay the tax shown on the return is due to reasonable cause if the taxpayer exercised ordinary business care and prudence and was nevertheless unable to pay the tax within the prescribed time. See sec. 301.6651-1(c)(1), Proced. & Admin. Regs. Willful neglect is defined as "a conscious, intentional failure or reckless indifference." United States v. Boyle, 469 U.S. at 245. Petitioner must show that reasonable cause existed at the time payment of the estate tax was due. See Estate of La Meres v. Commissioner, 98 T.C. at 324.

The Court dealt with this question and reached opposite results in Estate of La Meres v. Commissioner, 98 T.C. at 324, and Bank of the West v. Commissioner, 93 T.C. at 472. In Estate of La Meres, the Court held that the addition to tax under section 6651(a)(2) did not apply because (among other reasons) at the time the estate tax was due the taxpayer reasonably believed that a section 6166 election was proper. The Court in Estate of La Meres noted that the Internal Revenue Service had initially accepted the taxpayer's section 6166 election. See Estate of La Meres v. Commissioner, 98 T.C. at 324. In Bank of the West the Court held that the taxpayer's reliance on a section 6166 election was not reasonable. See Bank of the West v.

Commissioner, 93 T.C. at 472.  The Court in Bank of the West
noted that there was no "evidence of any action by the Internal
Revenue Service exercising its discretion to permit the payment
of the tax in installments."  Id. at 473.  Because reasonable
cause must have existed when the tax was due, the significance of
the Internal Revenue Service's action or inaction regarding a
section 6166 election is in determining the taxpayer's
reasonableness in believing that a valid election was made at the
time the tax was due.

In the instant case petitioner's executor, Hinz, at the time
the estate tax was required to be paid reasonably believed that
the section 6166 election was valid.  Before the extended due
date for payment of the tax, Christy advised Hinz that a section
6166 election could be made to pay the estate tax in
installments.  Hinz as executor of the estate relied on this
advice.  Furthermore, respondent, having the untimely filed
return and a copy of the approved request for extension of time
to file, tentatively approved petitioner's section 6166 election.
Under these circumstances, we hold that Hinz exercised ordinary
business care and prudence in providing for the payment of
petitioner's tax liability subject to the section 6166 election.

We hold for petitioner on this issue.

To take account of the parties' concessions and of our determinations as to the valuations of several assets, and the effect of these concessions and determinations on the calculations of the amounts of the section 6651(a)(1) addition to tax,

Decision will be entered under Rule 155.
